**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ROBERT and COLLEEN BARTLETT;**
**WLLIAM and MICHELLE BARRINGTON, III;**
**KIM CALVERASE; DANIEL and VERUSKA**
**DANTUONO; DAVID and JULIETTE DEDO;**
**TIMOTHY and SALLY DELANY; BRIAN and**
**TRACY DELLOW; RON GRYZLEC; BRENDA**
**CARPENTER; DOUGLAS and CHARLENE**
**HART; THOMAS and KIMBERLY KSHYNA;**
**MATTHEW and TRACY LICAMELI; JOHN and**
**KATHLEEN MARINELLI; WILLIAM and**
**STEPHANIE MATHEWSON; PETER and**
**JENAFER MEDINA; BRYAN MIGNONE;**
**ELAINE EVERITT; BRIAN and KIMBERLY**
**MURPHY; SCOTT and JILL MUSEMECI;**
**JERRY and KRISTINA PARZYCH; JONATHAN**
**and MARGARET PATCH; TIMOTHY and**
**SHARON PIEPER; FREDERICK and HEATHER**
**PUCHTA; LYNORE and MARK de la ROSA;**
**ROBERT and LORI SMITH; JOEY ST. LOUIS;**
**ROBERT and MEGAN VERTUCCI; MICHAEL**
**and LYNDA WADE; DAVID CORRENTE; GARY**
**CORRENTE; LUCY CORRENTE; SARAH**
**MARTINELLI; DEBORAH ROSS, individually and**
**as the representative of the Estate of Edward Wilbur***;*
**THOMAS and KIMBERLY GDULA; MICHAEL and**
**ALPHA KSHYNA; and MCKENZIE YOST,**

**Plaintiffs,**

**v.**

**HONEYWELL INTERNATIONAL, INC.,**

**Defendant.**

**5:13-CV-365**
**(FJS/DEP)**

_____

**APPEARANCES**                          **OF COUNSEL**

**MCALLION & ASSOCIATES, LLP**          **KENNETH F. MCCALLION, ESQ.**
100 Park Avenue – 16th Floor
New York, New York 10017
Attorneys for Plaintiffs

**LARSEN ADVOCATES, P.C.**              **KRISTIAN K. LARSEN, ESQ.**
104 First Place
Brooklyn, New York 11231
Attorneys for Plaintiffs

**ARNOLD & PORTER KAYE SCHOLER**        **ANDREA M. BROACH, ESQ.**
601 Massachusetts Avenue N.W.           **BRIAN D. ISRAEL, ESQ.**
Washington, District of Columbia 20001  **GEOFFREY J. MICHAEL, ESQ.**
Attorneys for Defendant

**GILBERTI, STINZIANO, HEINTZ**          **ANTHONY P. RIVIZZIGNO, ESQ.**
**& SMITH, P.C.**
555 East Genesee Street
Syracuse, New York 13202
Attorneys for Defendant

**OFFICE OF LISA DIPOALA HABER**         **LISA A. DIPOALA HABER, ESQ.**
217 Montgomery Street
Syracuse, New York 13202
Attorneys for Defendant

**SCULLIN, Senior Judge**


## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Pending before the Court is Defendant's motion to dismiss Plaintiffs' amended complaint pursuant to Rule 12(b)(6) and (7) of the Federal Rules of Civil Procedure.  *See generally* Dkt. No. 109.

## II. BACKGROUND[1]

In 1989, New York State sued Allied-Signal Inc., seeking to compel Allied-Signal to undertake the cleanup of Onondaga Lake under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). In 1992, Allied-Signal Inc. and New York State entered into a consent decree requiring Allied-Signal to undertake a remedial investigation and feasibility study for the Onondaga Lake Superfund Site in compliance with the regulations promulgated under CERCLA. *See* 42 U.S.C. § 9605. Defendant is the successor to Allied-Signal Inc.

In 1993, the United States Environmental Protection Agency ("EPA") and New York State Department of Environmental Conservation ("DEC") entered into a cooperative agreement pursuant to CERCLA § 104(d), 42 U.S.C. § 9604(d), with respect to the Onondaga Lake Superfund Site ("Cooperative Agreement"). The Cooperative Agreement provided that DEC would be the lead agency with respect to the site and would prepare, subject to EPA's approval, draft records of decisions setting forth the proposed remedial actions for each of the subsites of the Onondaga Lake Superfund Site, including the Onondaga Lake Bottom Subsite ("Site"), which is the subject of this action.

In 2004, following the completion of a Remedial Investigation and Feasibility Study ("RI/FS"), DEC issued a proposed cleanup plan for the Site ("Proposed Plan"), which DEC determined to be "protective of human health and the environment." The Proposed Plan called for dredging up to 2.65 million cubic yards of sediment from the lake and transporting those sediments to a sediment consolidation area that Defendant would construct on its property in the

---

[1] The Court has drawn much of the following background information from its previous Memorandum-Decision and Order. *See* Dkt. No. 49.

Town of Camillus. The Proposed Plan was subject to public comment from November 29, 2004, until March 1, 2005, and, after the concurrence of EPA, again from April 1, 2005, until April 30, 2005.

Following public comment, in accordance with CERCLA's requirements, EPA and DEC issued a joint record of decision ("ROD") for the Site that set forth the selected remedy for the Site. Among other things, the ROD required dredging an estimated 2.65 million cubic yards of sediment from the lake bottom. In addition, the ROD required that dredged sediment be transported via pipeline to a sediment contamination area ("SCA") located in the Town of Camillus for treatment and storage. The ROD stated that EPA and DEC had determined that the selected remedy met the requirements set forth in CERCLA § 121, 42 U.S.C. § 9621, because, among other things, it was "protective of human health and the environment."

In 2006, Defendant and DEC agreed to enter into a proposed consent decree requiring Defendant to conduct the selected remedy for the Site set forth in the ROD that the DEC and EPA had issued. The proposed consent decree was subject to public comment from October 12, 2006, to November 13, 2006. On January 4, 2007, this Court entered the proposed consent decree ("Consent Decree") as an Order of the Court. The Statement of Work, Appendix C to the Consent Decree, required that Defendant make good faith efforts to design and construct the SCA within five years of entry of the Consent Decree and complete dredging operations within four years of construction.

Following entry of the Consent Decree, pursuant to its Cooperative Agreement with EPA, DEC retained primary oversight authority for the Site. Notably, DEC retained authority to review and approve Defendant's technical submittals prior to the start of dredging. Following

DEC approval, all submittals were "incorporated into and bec[a]me an enforceable part of [the] Consent Decree."

Throughout the design of the SCA, Defendant submitted to DEC for approval a range of documents regarding a variety of technical issues at the SCA, including those relevant to the health and safety of the project. In 2012, DEC approved the Community Health and Safety Plan for the project ("CHASP"), which detailed health and safety measures integrated into the project for the protection of the community and required the implementation of a comprehensive air monitoring program. Later that year, DEC approved the Quality Assurance Project Plan for the Air Quality Monitoring Program ("QAPP"), which detailed the air monitoring program for the SCA, including the air quality standards established for the Site. Pursuant to its obligations under the Consent Decree, Defendant initiated dredging of the lake bottom and transporting dredged materials to the SCA in 2012.

On March 18, 2013, Plaintiffs filed their original complaint in this action in New York Supreme Court, Onondaga County. In their complaint, Plaintiffs asserted four causes of action grounded on the following theories: (1) negligence, (2) nuisance, (3) premises liability, and (4) trespass. In their complaint, Plaintiffs also asked for injunctive relief.

This Court subsequently granted Defendant's motion to dismiss Plaintiffs' claims for injunctive relief because it concluded that "it [did] not have subject matter jurisdiction over" those claims. *Camillus Clean Air Coal. v. Honeywell Int'l, Inc.*, 947 F. Supp. 2d 208, 216 (N.D.N.Y. 2013).

After additional motion practice regarding remand, Defendant filed a motion for judgment on the pleadings. *See* Dkt. No. 101. After conferring with Plaintiffs, Defendant

withdrew its motion and allowed Plaintiffs to file an amended complaint, which Plaintiffs thereafter filed on April 13, 2015. *See* Dkt. No. 107.

In their amended complaint, Plaintiffs assert three causes of action: (1) Defendant failed to employ reasonable care under the circumstances in implementing and in choosing the various methods for remediation at the Site, s*ee id*. at ¶¶ 254-269; (2) Defendant maintained a dangerous condition on its property that created a private nuisance, s*ee id*. at ¶¶ 271-274; and (3) Defendant's actions "caused toxic chemical particulates, both visible and invisible, to be released into the air in the form of vapor and dust which then landed on Plaintiffs' real property and persons," s*ee id.* at ¶ 276.

Defendant subsequently filed the pending motion to dismiss based on the following grounds: (1) Plaintiffs lacked standing to challenge the Consent Decree; (2) CERCLA § 122(e)(6) preempted Plaintiffs' claims; (3) DEC was an indispensable party that could not be joined because of sovereign immunity; and (4), regardless of the merits of the first three grounds, Plaintiffs failed to allege any plausible state-law causes of action. *See generally* Dkt. No. 109.

## III. DISCUSSION

### A.    Standard of review

Courts use a two-step inquiry when addressing a Rule 12(b)(6) motion. "First, they isolate the moving party's legal conclusions from its factual allegations." *Hyman v. Cornell Univ.*, 834 F. Supp. 2d 77, 81 (N.D.N.Y. 2011). Second, courts must accept factual allegations as true and "determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A pleading must contain more than a "blanket assertion[ ] of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007). Thus, to

withstand a motion to dismiss, a pleading must be "plausible on its face" such that it contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted).

Furthermore, when addressing a Rule 12(b)(6) motion, a court may "consider documents attached to or incorporated by reference in [a] complaint[.]" *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998) (citation omitted). Even where "'a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint,' the court may . . . take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (quotation omitted).

In this case, the Court has considered Plaintiff's amended complaint as well as the documents appended to the complaint.

**B.      Conflict preemption**

*1. The parties' positions*

Defendant argues that Plaintiffs' amended complaint alleges that "certain choices in designing and implementing the Onondaga Lake remediation were made in error and give rise to State common law claims, even though these choices were thoroughly considered and approved by DEC and are enforceable requirements under the Consent Decree." *See* Dkt. No. 109-1 at 7. More specifically, Defendant characterizes Plaintiffs' amended complaint as resting "upon the premise that [Defendant] should have undertaken remedial actions other than those thoroughly considered and authorized by DEC, such as using a different sediment containment strategy or a

different air monitoring plan." *See id.* at 9.  However, Defendant contends that CERCLA

§ 122(e)(6), 42 U.S.C. § 9622(e)(6), explicitly prohibits it from undertaking any remedial actions

other than those that the Consent Decree authorizes.  *See id.* (quoting 42 U.S.C. § 9622(e)(6))

According to Defendant, "Congress left no question here -- potentially responsible parties

("PRPs") such as [Defendant] must act in accordance with agency direction and may not engage

in remedial activity that is not authorized by the agency." *See id.* at 10.  Therefore, according to

Defendant, "[a]llowing Plaintiffs' claims to proceed would contravene not only the plain text of

§ 122(e)(6), but also its purpose -- to reinforce administrative agency authority over the

implementation of a CERCLA remedy by prohibiting remedial actions that have not been

approved by the agency through the formal remedial plan procedures of CERCLA." *See id.*

Defendant further asserts that § 122(e)(6) serves "'to promote the policy of environmentally

sound and cost effective clean up through governmental, community and private party input into

the decisionmaking process.'" *See id.* (quoting *Allied Corp. v. Acme Solvents Reclaiming, Inc.*,

691 F. Supp. 1100, 1110 (N.D. Ill. 1988)).  Indeed, Defendant contends that "unauthorized

remedial actions would undermine the public participation and input that occurred during this

formal decision-making process." *See id.* (citing *United States v. Drum Serv. Co. of Fla.*, 109 F.

Supp. 2d 1348, 1357-59 (M.D. Fla. 1999)).

In essence, Defendant argues that Plaintiffs base their common-law claims on

Defendant's failure to take remedial action that the overseeing agencies never authorized.  *See id.*

at 11.  Accordingly, Defendant asserts that "Plaintiffs cannot, through the imposition of state

common law liability, force [Defendant] to pay damages for failure to undertake remedial actions

that would have been contrary to the authorized, carefully considered remedy in the cleanup plan

and Consent Decree." *See id.*

Defendant further contends that CERCLA § 302(d), 42 U.S.C. § 9652(d), one of CERCLA's savings clauses, "does not necessarily operate to preserve any and all state law claims." *See* Dkt. No. 115 at 4 (citing *New Mexico v. Gen. Elec. Co.*, 467 F.3d 1223 (10th Cir. 2006)). In that vein, Defendant asserts that state-law claims are preempted if they request relief that is inconsistent with the mandates of CERCLA. *See id.* (citing *New Mexico*, 467 F.3d at 1244). Defendant explains that, "[i]n *New Mexico*, the Tenth Circuit found that CERCLA preempted plaintiffs' state law claims because the natural resource damages plaintiffs sought were duplicative of damages available under CERCLA, and if those damages had been sought under CERCLA, rather than state law, their post-awarded uses would be more restricted." *See id.* According to Defendant, the Tenth Circuit's rationale was "that if state law damages sought by a plaintiff directly conflict with some other mandate within CERCLA, those claims cannot proceed." *See id.* at 5.

Defendant argues that, in this case, Plaintiffs seek damages premised on its failure to perform remediation activities that the Consent Decree did not approve. *See id.* Defendant contends that "[a]llowing Plaintiffs' claims to proceed would mean that a CERCLA responsible party . . . could be faced with the untenable choice between either: (a) violating CERCLA § 122(e)(6); or (b) violating state law." *See id.*

Finally, Defendant asserts that CERCLA's savings clause was not meant to preserve the type of claims that Plaintiffs bring in this suit. According to Defendant, "the congressional intent behind CERCLA was to 'provide a vehicle for cleaning up . . . improperly disposed of hazardous substances,' and the purpose of the Savings Clause was 'merely to nix an inference that the statute in which it appears is intended to be the exclusive remedy for harms caused by the violation of the statute.'" *See id.* (internal citation omitted). In other words, the savings clause

"is intended to preserve state law claims relating to the underlying contamination CERCLA was enacted to address (i.e., the contamination of the sediment in Onondaga Lake), and not those relating to remediation activities mandated by a consent decree." *See id*. at 6. Thus, Defendant argues that the savings clause does not give Plaintiffs a right to bring state-law claims for alleged harms arising out of activities that it was required to perform pursuant to a CERCLA remedial order. *See id*.

Plaintiffs description of the nature of their claims is, not surprisingly, very different than Defendant's. In this regard, Plaintiffs assert that their "Amended Complaint clearly alleges that [Defendant's] actions give rise to a tort action, both independent of, and in connection with [its] negligent performance of its obligations under the Consent Decree." *See* Dkt. No. 113 at 8. According to Plaintiffs, Defendant was obligated to ensure that emissions of toxic substances from the remediation site would not be harmful to the surrounding community. *See id*. Plaintiffs argue that they are not seeking to "challenge" or "enforce" the provisions of the Consent Decree. *See id*. Rather, Plaintiffs contend that they are merely bringing common law claims based on Defendant's negligent remediation. *See id.* at 9. Thus, Plaintiffs argue that Defendant's "attempt to use the Consent Decree as a shield against common law liability must fail." *See id.* at 10. In other words, according to Plaintiffs, "the Consent Decree does not immunize [Defendant] for the grievous injuries inflicted on Plaintiffs, and Plaintiffs have standing to redress these wrongs." *See id*.

Furthermore, Plaintiffs assert that CERCLA § 122(e)(6) does not preempt their claims. *See id*. According to Plaintiffs, Defendant's argument blatantly ignores "the plain language of CERCLA § 302(d), which provides that

[n]othing in this chapter shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law,

> with respect to releases of hazardous substances or other pollutants or
> contaminants.  The provisions of this chapter shall not be considered, interpreted,
> or construed in any way as reflecting a determination, in part or whole, of policy
> regarding the inapplicability of strict liability, or strict liability doctrines, to
> activities relating to hazardous substances, pollutants, or contaminants or other
> such activities.

*See id.* (quoting 42 U.S.C. § 9652(d)).

Furthermore, Plaintiffs point to two additional CERCLA provisions that they contend show that their claims are not preempted.  For example, CERCLA § 309(a)(1), 42 U.S.C. § 9658(a)(1), provides for when the state statute of limitations applies to personal injury claims brought under state law.  *See id.* (citing 42 U.S.C. § 9658(a)(1)).  Moreover, CERCLA § 301(e)(1), 42 U.S.C. § 9651(e)(1), which is entitled "Adequacy of existing common law remedies," authorized a study "'to determine the adequacy of existing common law and statutory remedies in providing legal redress for harm to man and the environment caused by the release of hazardous substances.'" *See id.* (quoting 42 U.S.C. § 9651(e)(1)).

In further support of their position, Plaintiffs cite *Abbo-Bradley v. City of Niagara Falls*, No. 13-CV-487, 2013 WL 4505454 (W.D.N.Y. Aug. 22, 2013), for the proposition that "'Congress expressly disclaimed an intent to preempt state tort liability for damages caused by the release of hazardous substances.'" *See id.* at 11 (quoting *Abbo-Bradley*, 2013 WL 4505454 at *6).  Furthermore, Plaintiffs argue that *Vill. of DePue, Ill. v. Exxon Mobil Corp.*, 537 F.3d 775 (7th Cir. 2008), "explicitly recognized that CERCLA contemplates 'action[s] brought under State law for personal injury, or property damages.'" *See id.* (quoting *DePue*, 537 F.3d at 786 [(quoting 42 U.S.C. § 9652(d))]).

Additionally, Plaintiffs assert that Defendant's reliance on *New Mexico* is inappropriate because "'CERCLA's savings clauses (as well as other CERCLA provisions) undoubtedly preserve a quantum of state legislative and common law remedies related to the release and

cleanup of hazardous waste.'" *See id.* (quoting *New Mexico*, 467 F.3d at 1246).  Furthermore, Plaintiffs attempt to distinguish *New Mexico* because it involved "a state plaintiff's attempt to seek natural resource damages ('NRD') under duplicative and conflicting CERCLA and state public nuisance and negligence theories of recovery, while the plaintiffs here seek damages for personal injuries and property damages available only under common law." *See id.*

In that regard, Plaintiffs assert that their "common law claims for personal injuries and property damages are neither duplicative of other claims under nor 'contrary to the authorized, carefully considered remedy in the cleanup plan and the Consent Decree.'" *See id.* at 12 (quoting Dkt. No. 109-1 at 11).  Plaintiffs argue that they "do not challenge the DEC or the EPA's regulatory authority to choose and authorize remedial actions, or any other provisions of the Consent Decree; nor are Plaintiffs' claims contrary to Congress' objectives in enacting CERCLA." *See id.*  In fact, Plaintiffs assert that

> the gravamen of [their] claims are that [Defendant], through its failure to perform and use due care in performing the required APA and other procedures, as mandated by the Consent Decree, CERCLA, the NCP, the ECL, and the DEC-approved Work Plans, and through its inaccurate representations to the DEC, the EPA and the public, circumvented the authority of the DEC and the EPA and the right of the public to meaningfully participate in the remedial decision making process.

*See id.*


### 2. Analysis

The Supremacy Clause of Article VI of the United States Constitution allows Congress to enact laws that preempt state or local law.  Federal preemption can operate in one of three ways. *See Bedford Affiliates v. Sills*, 156 F.3d 416, 426 (2d Cir. 1998) (overruled on other grounds) (citations omitted).

> First, Congress may in express terms declare its intention to preclude state regulation in a given area. . . . Second, preemption may be implied when federal law is "sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." . . . Third, state law may be preempted to the extent that it actually conflicts with a valid federal statute." . . .

*Id.* (internal quotations and citation omitted).

With respect to the first form, known as "express preemption," it is well established that CERCLA does not expressly preempt state law. *See State of N.Y. v. Shore Realty Corp.*, 759 F.2d 1032, 1041 (2d Cir. 1985) (citation omitted). As to the second form, known as "field preemption," the courts have held that Congress did not intend "that CERCLA be a comprehensive regulatory scheme occupying the entire field of hazardous wastes[.]" *Bedford*, 156 F.3d at 426.

Therefore, in this case, whether CERCLA preempts Plaintiffs' state-law claims for negligence, private nuisance, and trespass turns on the third form, "conflict preemption." Conflict preemption occurs where "'compliance with both federal and state [law] is a physical impossibility'" or where state law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quotations omitted).

Defendant contends that CERCLA § 122(e)(6) explicitly prohibits it from undertaking any remedial actions other than those that the Consent Decree authorizes. Specifically, CERCLA § 122(e)(6) provides that,

> [w]hen either the President, or a potentially responsible party pursuant to an administrative order or consent decree under this chapter, has initiated a remedial investigation and feasibility study for a particular facility under this chapter, no potentially responsible party may undertake any remedial action at the facility unless such remedial action has been authorized by the President.

42 U.S.C. § 9622(e)(6).[2]

In essence, Defendant argues that Plaintiffs seek to hold it liable for damages allegedly resulting from activities that were consistent with the Consent Decree, on a theory that Defendant should have conducted additional or different remediation. However, Defendant contends that it would have violated CERCLA § 122(e)(6) had it engaged in any alternative remedial measures. Accordingly, Defendant argues that Plaintiffs' claims directly conflict with CERCLA because it is impossible for Defendant to comply with federal law (the Consent Decree and CERCLA § 122(e)(6)) and also avoid potential exposure to state common-law claims.

A number of courts have held that consent decrees entered into pursuant to environmental laws sufficiently conflict with state law to warrant preemption. For example, in *Feikema v. Texaco, Inc.*, 16 F.3d 1408 (4th Cir. 1994), a group of property owners sued a defendant alleging nuisance and trespass as a result of the release of toxic substances on their property. *See id.* at 1411. Prior to the plaintiffs' suit, EPA -- under the authority of the Resource Conservation and

---

[2] Section 122(e)(6) "serve[s] to promote the policy of environmentally sound and cost effective clean up through governmental, community and private party input into the decisionmaking process." *Allied Corp. v. Acme Solvents Reclaiming, Inc.*, 691 F. Supp. 1100, 1110 (N.D. Ill. 1988). In *Allied Corp*, the court held that a defendant could not argue that EPA approved its remediation plan by "passive acquiescence." *See id.* The court further stated that,

> [i]n by-passing the safeguards of Section 122, passive acquiescence would serve to undermine this policy. Surely Congress did not intend under Section 122(e)(6) that, once the EPA initiates a remedial investigation and feasibility study, PRP's are free to undertake their own chosen form of remedy and then recover costs in federal court under the theory, "the agency didn't tell us we couldn't!" Authorization under Section 122(e)(6) cannot be proved by a showing of Agency passive acquiescence.

*Id*.

Thus, the policy underpinning CERCLA § 122(e)(6) is to create a careful partnership between the PRP and the responsible agency to ensure the appropriate remedial action is taken.

Recovery Act ("RCRA") -- entered into a consent decree whereby the defendant agreed to undertake a specific clean-up plan. *See id.* Similar to Defendant here, the defendant in *Feikema*, "argue[d] that homeowners are, through their state law actions for nuisance and trespass, seeking injunctive relief that would conflict with the existing Consent Order between [defendant] and the EPA." *Id.* at 1415. The defendant argued "further that complying with any court order based on state law would force [the defendant] to violate the Consent Order's requirement that any corrective action be submitted to and approved by the EPA." *Id.* After holding that the consent decree carried the same weight as any other federal law, the Fourth Circuit ultimately held that the injunctive relief that the plaintiffs requested "would conflict with the remedial measures selected and supervised by the EPA." *Id.* at 1416.

In his concurring opinion in *Feikema*, Judge Murnaghan stated that, "[b]ecause it apparently would be impossible for [the defendant] to comply with both orders, we hold that, so long as the (federal-law) Consent Order remains in effect, it preempts the (state-law) injunctive order that plaintiffs have requested." *Id.* at 1418 (Murnaghan, J., concurring). Judge Murnaghan further concluded that the analysis is the same with regard to damages claims.[3] In that vein, he stated that the court "would not allow the plaintiffs to gain indirectly, through the threat of monetary damages, what [the court has] expressly prevented them from gaining directly through an injunction -- mandatory clean-up measures that are incompatible with those already approved by the EPA." *Id.* He stressed that, whatever the relief sought, a "claim is preempted *only* to the extent that it may actually conflict with the EPA's Consent Order and *only* while that Order remains in effect." *Id.*

_____

[3] The majority opinion held that the damages claims were not preempted because the Consent Order did not provide for damages payments to homeowners, thus, awarding damages to the plaintiffs would not conflict with the Consent Order. *See Feikema*, 16 F.3d at 1417-18.

The Fourth Circuit later addressed *Feikema* in *Cavallo v. Star Enter.*, 100 F.3d 1150 (4th Cir. 1996), and held that a PRP "cannot be held liable for activities *in conformity* with the EPA Orders." *Id*. at 1156. In doing so, the court recognized that *Feikema* allowed the plaintiffs' damages claims to go forward but only to the extent, as Judge Murnaghan alluded to, that they do not conflict with the Consent Order. *See id*. The court then determined that "[d]amages claims conflict with EPA Orders only if the allegedly tortious activities (1) were required, directed, or supervised by the EPA, and (2) were performed properly." *Id*. In discussing the plaintiffs' claims in that case, the court advised that "incidents of improper operation, supervision, management, design, installation, repair, and updating of the [waste site or its equipment] may be actionable if not compelled by the EPA Orders." *Id*. at 1157.

Two district court cases in the Second Circuit involve somewhat analogous factual situations. First, in *Town of Halfmoon v. Gen. Elec. Co.*, 105 F. Supp. 3d 202 (N.D.N.Y. 2015), the plaintiffs sought damages for the defendants' allegedly negligent dredging operation that was undertaken in conformance with a court-ordered Consent Decree. *See id*. at 217. The court recognized that the CERCLA savings clauses may allow for common law claims that concern the *original* hazardous waste deposit, but plaintiffs were instead attacking "the dredging project and the environmental and health threats stemming therefrom." *Id*. at 218. The court found that "[i]t is impossible for [the defendant] to comply with the requirements of the Consent Decree without subjecting itself to liability under state statutory and common law, which is an obstacle to the execution of the dredging project." *Id*. at 217-18. Ultimately the court concluded that the "plaintiffs' state law claims interfere with the implementation of a remedial action ordered by a federal agency (EPA), per federal law (CERCLA), approved by this federal court." *Id*. at 218.

Furthermore, the court rejected the plaintiffs' argument that they only sought monetary damages. *See id.* (citing *New Mexico*, 467 F.3d at 1249-50).

Similarly, in *Coastline Terminals of Conn., Inc. v. USX Corp.*, 156 F. Supp. 2d 203 (D. Conn. 2001), the court held that the plaintiffs' "state law actions pursuant to [a state statute] and common law negligence related to hazardous waste releases disrupt[ed] CERCLA's settlement incentive scheme by providing a potential avenue for recovery against a potentially responsible party that has settled a CERCLA action." *Id.* at 208. Therefore, the court held that "the state law claims based on allegations of hazardous waste releases [were] preempted." *Id.* at 209

In addition, in *New Mexico*, the Tenth Circuit held that "CERCLA's comprehensive NRD scheme preempts any state remedy designed to achieve something other than the restoration, replacement, or acquisition of the equivalent of a contaminated natural resource." *Id.* at 1247. The Tenth Circuit reasoned that allowing the state to by-pass CERCLA's statutory scheme to collect NRD damages based on negligence and nuisance theories would conflict with CERCLA because it could lead to double-recovery. *See id.* at 1248.

The Tenth Circuit went on to dismiss the plaintiff's common-law claims arguing that the site cleanup was inadequate, stating that "[a]ny relief provided the State would substitute a federal court's judgment for the authorized judgment of both the EPA and NMED (lest we forget an arm of the State) that the cleanup is not only comprehensive but flexible and dynamic, readily adjusting as new data is received." *Id.* at 1249-50 (citation omitted). The court further stated that it would "not permit the State to achieve indirectly through the threat of monetary damages, . . . what it [could not] obtain directly through mandatory injunctive relief incompatible with the

ongoing CERCLA-mandated remediation." *Id.* at 1250[4] (citing *Feikema v. Texaco, Inc.*, 16 F.3d 1408, 1418-19 (4th Cir. 1994) (Murnaghan, J., concurring)) (other citations omitted).

Plaintiffs rely on *Abbo-Bradley v. City of Niagara Falls*, No. 13-CV-487-JTC, 2013 WL 4505454 (W.D.N.Y. Aug. 22, 2013), for the proposition that "it is uniformly recognized that, in enacting CERCLA, Congress expressly disclaimed an intent to preempt state tort liability for damages caused by the release of hazardous substances." *Id.* at *6. However, that statement and the case as a whole only addressed express preemption while considering a district court's decision to remand a case back to state court. *See id.*

Furthermore, Plaintiffs allege that *Vill. of DePue, Ill. v. Exxon Mobil Corp.*, 537 F.3d 775 (7th Cir. 2008), "explicitly recognized that CERCLA contemplates 'action[s] brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility.'" *See* Dkt. No. 113 at 11 (quoting *DePue*, 537 F.3d at 786). However, the text in *DePue* to which Plaintiffs refer simply quotes CERCLA's savings clause without any analysis. *See DePue*, 537 F.3d at 786 (quoting 42 U.S.C. § 9658(a)(1)). Thus, *DePue* only "recognized" the uncontroversial reality that CERCLA does not expressly preempt *all* state law. The court in *DePue* declined to decide whether conflict preemption existed in that case because the defendant had not shown that there was any federal law that conflicted with the plaintiffs' claims. *See id.*

---

[4] The Tenth Circuit's discussion cited in this section addressed a CERCLA jurisdictional requirement, which provides that "[n]o Federal Court shall have jurisdiction . . . under State law . . . to review any challenges to removal or remedial action selected. . . ." 42 U.S.C. § 9613(h). The court dismissed those claims that challenged aspects of the selected remedy because the remediation was not completed. *See New Mexico*, 467 F.3d at 1250. The court reasoned that, "§ 9613(h) reflects Congress's judgment that residual injury, if any . . . be addressed at the conclusion of the EPA-ordered remediation." *Id.* (citation omitted).

Finally, Plaintiffs contend that CERCLA § 302(d)'s plain language expressly allows their claims. CERCLA § 302(d) provides that "[n]othing in this chapter shall affect or modify in any way the obligations or liabilities of any person under other Federal or State law, *including common law, with respect to releases of hazardous substances or other pollutants or contaminants.*" 42 U.S.C. § 9652(d) (emphasis added). However, as is clear from the Second Circuit's decision in *Bedford*, as well as many of the above-cited cases, CERCLA's Savings Clause does not contemplate that *any* and *all* common-law claims can go forward. Further, as Defendant persuasively argues, "[t]he logical reading of the Savings Clause is that it is intended to preserve state law claims relating to the underlying contamination CERCLA was enacted to address (i.e., the contamination of the sediment in Onondaga Lake), and not those relating to remediation activities mandated by a consent decree." *See* Dkt. No. 115 at 6; *accord Town of Halfmoon*, 105 F. Supp. 3d at 217.

Based on the foregoing, several principles appear. First, state-law claims that create an actual conflict with CERCLA are preempted. Second, consent decrees entered into pursuant to CERCLA, which require a PRP to undertake specific action or contravene CERCLA § 122(e)(6), qualify as federal law that can conflict with state law. Third, preemption may apply if the plaintiffs' claims merely allege activity that is consistent with a consent decree, regardless of the damages that plaintiffs seek, i.e., injunctive relief or monetary damages. In sum, these principles track the test the court articulated in *Cavallo*, that "[d]amages claims conflict with [a consent decree and, are thus preempted,] only if the allegedly tortious activities (1) were required, directed, or supervised by the EPA, and (2) were performed properly." *Cavallo*, 100 F.3d at 1156. Thus, the Court adopts these principles to analyze Plaintiffs' claims.

Plaintiffs assert that

> the gravamen of [their] claims are that [Defendant], through its failure to perform and use due care in performing the required APA and other procedures, as mandated by the Consent Decree, CERCLA, the NCP, the ECL, and the DEC-approved Work Plans, and through its inaccurate representations to the DEC, the EPA and the public, circumvented the authority of the DEC and the EPA and the right of the public to meaningfully participate in the remedial decision making process.

*See* Dkt. No. 113 at 12.

A closer examination of Plaintiffs' amended complaint, however, reveals that each of Plaintiffs' claims is based exclusively on the premise that Defendant should have conducted a more robust cleanup effort than the Consent Decree mandated.

The amended complaint first outlines each of the individual Plaintiffs' health and safety concerns, *see* Dkt. No. 107 at ¶¶ 3-86, and then explains in detail the alleged deficiencies in Defendant's implementation of the measures agreed upon in the Consent Decree to manage the Site (a/k/a "Wastebed 13").

First, Plaintiffs allege that Defendant's Community Health and Safety Plan ("CHASP") "described the Remedy selection and design as reducing or eliminating health hazards, including, but not limited to, use of a closed system, double containment, and geotextile tubes." *See id.* at ¶ 106. However, according to Plaintiffs, Defendant "negligently and/or falsely represented in its CHASP" that Wastebed 13 was a "closed system." *See id.* at ¶ 107. Furthermore, Plaintiffs maintain that Defendant negligently and/or misleadingly reported that the method selected (pumping dredged sediments into geotextile tubes) would minimize the amounts of contaminants that are exposed to the atmosphere. *See id.* at ¶ 109. Plaintiffs add that, "[w]hen the highly contaminated slurry reached Wastebed 13, it was pumped and dewatered into and through porous geotextile tubes (or 'geotubes'). The removed water was treated, and the geotubes were placed in

onsite impoundments while they 'cured,' sequestering the contaminants (in theory) until such time the geotubes were dry enough for the impoundment to be capped." *See id.* at ¶ 112.

Furthermore, Plaintiffs allege that an Air Pathways Analysis ("APA") must be performed at any Superfund site. *See id.* at ¶ 114. However, Plaintiffs maintain that Defendant "ultimately failed to conduct and/or supervise a complete and proper [APA] to quantify potential emissions of [compounds of interest ("COIs")] from the sediment dewatering system component of the Remediation, as required under the Consent Decree and Defendant's own work plans." *See id.* at ¶ 118. In that vein, Plaintiffs allege that, after Defendant completed a Phase I bench-scale emissions testing, which tested the emissions of 21 COIs, it stopped testing for ten of twenty-one original COIs. *See id.* at ¶ 128. According to Plaintiffs, Defendant should have never discontinued its study because further testing showed that there was a significant amount of these COIs in the dredged sediment. *See id.* at ¶ 134. Thus, Plaintiffs contend that, "[a]t the very least, additional bench-scale testing should have been performed[.]" *See id.* at ¶ 136. Furthermore, Plaintiffs allege that "all bench-scale testing was discontinued" after Defendant "decided to eliminate the open basin in lieu of the geotubes[.]" *See id.* at ¶ 139.

Moreover, Plaintiffs claim that Defendant shifted the focus of its studies "from quantifying and controlling hazardous emissions to controlling/mitigating 'odors' from only those compounds that reached detectable odor thresholds." *See id.* at ¶ 144. As a result, Plaintiffs allege that "the potential release into the air of dangerous chemical compounds known to be present in the Lake sediment to be dredged, such as mercury and hexachlorobenzene, was not even tested." *See id.* at ¶ 145.

Additionally, Plaintiffs assert that Defendant's decision to begin using geotubes coincided with its decision to discontinue further bench-scale testing.  *See id.* at ¶¶ 150-155.  Furthermore, Plaintiffs allege that Defendant,

> [i]n an ill-conceived and failed effort to prove that its geotube dewatering method was safe, in May 2010, proposed a risk assessment method (the "Risk Assessment Method") which, instead of relying on actual measured data, improperly assumed the existence of contaminant "safe levels" at the SCA perimeter (assigned previously by the EPA and DEC), and then assumed that these safe-level concentrations were then diluted as the airborne contaminants were carried to the nearby residential community where the Plaintiffs lived.

*See id*. at ¶ 156.

In short, according to Plaintiffs, "once the decision was made to abandon the open-basin dewatering system in favor of the geotube system, [Defendant] abandoned the APA process altogether."  *See id.* at ¶ 159.

Plaintiffs also contend that Defendant's Perimeter Air Monitory System ("PAM") was "incapable of detecting hazardous emissions from Wastebed 13[.]"  *See id.* at ¶ 160.  Thus, Plaintiffs assert that Defendant improperly relied on the results of the PAM to determine that the emissions levels were safe.  *See id*. at ¶¶ 161-162.

Plaintiffs additionally allege that Defendant knew that Wastebed 13 was actively emitting high-levels of toxic chemicals into the air and consequently that DEC "ordered (or strongly suggested to [Defendant])" that the site be shut down.  *See id*. at ¶ 165.  Plaintiffs contend, "upon information and belief," that the shut-down was required because data was showing toxic quantities of VOCs, mercury, and hydrogen sulfide.  *See id*. at ¶ 166.  Plaintiffs further claim that Defendant subsequently issued its

> "Odor Mitigation Plan" which identified [that] actively filling geotubes as having the greatest potential for emissions and recommended supplemental control measures, including, but not limited, to a comprehensive and integrated, non-permeable geotube covering system, wind screens, reduced water flow to the

> SCA, an odor-control additive, large capacity fans, and an expansion of the misting system.

*See id.* at ¶ 225.

However, Plaintiffs maintain that they continued to experience odor after Defendant implemented the mitigation strategies. *See id.* at ¶ 228.

Furthermore, Plaintiffs describe a study, which the Town of Camillus commissioned, that alleges that there were toxic amounts of mercury and other chemicals in and around Wastebed 13. *See id.* at ¶¶ 68-73. This study was apparently based on data received that was part of Defendant's safety monitoring for its employees. *See id.* at ¶ 169. However, Plaintiffs contend that Defendant never tested for several of these toxic chemicals in its PAM monitoring and thus never knew that Plaintiffs were being exposed to toxic fumes emanating from Wastebed 13. *See generally id.* at ¶¶ 168-180.

Moreover, Plaintiffs assert that Defendant variously misrepresented its cleanup efforts and falsely assured that

> (i) extensive testing had been performed in order to predict potential emissions, including bench-scale testing, wind-tunnel testing, flux-chamber testing, odor characterization, collection of site-specific meteorological data, and dispersion modeling; (ii) air monitoring would be conducted during SCA operations to ensure protection in the event any emissions levels were exceeded; and (iii) contingency plans, such as covering the geotubes or reducing or ceasing dredging operations, would be implemented to correct the problem, should it be found that the SCA (Wastebed 13) was generating 'nuisance' odors.

*See id.* at ¶ 195.

In addition, Plaintiffs allege that Defendant was "negligent, reckless and/or intentionally misrepresenting" that the geotube system in place would be a "closed" system. *See id.* at ¶ 199.

Next, Plaintiffs contend that Defendant's risk assessment method was flawed and that EPA erroneously concluded that "geotextile dewatering operations at the SCA would be safe."

*See id.* at ¶¶ 205-208.  Further, Plaintiffs argue that the "number and spacing of monitors comprising the PAM system were incapable of detecting contaminant plumes in excess of the safe limits."  *See id.* at ¶ 217.  Consequently, Plaintiffs allege,

> upon information and belief, [Defendant's] air monitoring program had grossly inadequate "sampling densities," resulting in the following: (a) it had very little chance of ever capturing the highest 1-hour-averaged concentrations; and (b) it would require a duration far longer than the Remediation time-frame itself before enough data could be collected to facilitate a reasonable assessment of annual exposure.

*See id.* at ¶ 221.

In addition, Plaintiffs assert that Defendant never considered whether emissions could be coming from "streams of pressurized contaminated water."  *See id.* at ¶ 235.  Finally, Plaintiffs allege that Defendant was negligent in performing the remediation in the following ways: (1) Defendant should have known that geotubes were not closed systems, *see id.* at ¶ 244; (2) Defendant should have known that the hazardous chemicals did not remain in the sediment but instead were emitted onto Plaintiffs' properties from the air pathway and through "aerosolized spray/vapor," *see id.* at ¶¶ 245, 246; and (3) Defendant "failed to discover that geotubes were not capable of containing the emissions of the hazardous chemicals and thus failed to implement mitigative measures," *see id.* at ¶ 247.[5]

Based on the above, Plaintiffs alleged three common-law claims against Defendant: (1) Defendant failed to employ reasonable care in implementing and in choosing the various methods of remediation at Wastebed 13, s*ee id.* at ¶¶ 254-269; (2) Defendant maintained a dangerous condition on their property that created a private nuisance, *see id.* at ¶¶ 271-274; and

---

[5] Furthermore, Plaintiffs allege that the Site continues, and will continue, to be a source of hazardous chemical emissions despite Defendant's plan to place a permanent cap over the site. *See* Dkt. No. 107 at ¶¶ 250-253.

(3) Defendant's actions "caused toxic chemical particulates, both visible and invisible, to be released into the air in the form of vapor and dust which then landed on Plaintiffs' real property and persons," s*ee id.* at ¶ 276.  In essence Plaintiffs' claims are based on the theory that the EPA- and DEC-approved remediation plan was inadequate and resulted in their alleged damages.  Specifically, Plaintiffs' allegations, which the Court has to accept as true at this stage of the litigation, amount to an argument that Defendant should not have used geotubes to contain the dredged sediment and should have conducted additional air testing.  In other words, Plaintiffs' allegations are based on activities that "were required, directed, or supervised by the EPA" and DEC.  *Cavallo*, 100 F.3d at 1156.

Furthermore, nothing in Plaintiffs' Amended Complaint plausibly alleges that the selected remedy was *not* "performed properly."  *Id*.  Although Plaintiffs make conclusory allegations that Defendant negligently performed its remediation duties, all of the factual allegations that form the basis for Plaintiffs' claims relate to actions that were clearly contemplated in the Consent Decree.[6]  In other words, Plaintiffs fail to allege facts that plausibly give rise to an inference that Defendant executed the Consent Decree negligently; rather, at best, they merely assert that the chosen remedy was inadequate.  Similarly, Plaintiffs' nuisance and trespass claims simply allege damages based on actions that were consistent with the Consent Decree.

Thus, Plaintiffs are attempting to hold Defendant liable for activities consistent with the Consent Decree on the theory that Defendant should have conducted additional remediation that would have violated CERCLA § 122(e)(6).  Accordingly, the Court finds that Plaintiffs' claims

---

[6] In its amicus brief to this Court filed in support of Defendant's original motion to dismiss, the State of New York represented that Defendant had complied with the Consent Decree.  *See generally* Dkt. No. 31.

conflict with CERCLA and the Consent Decree and are, therefore, preempted. Thus, the Court

grants Defendant's motion to dismiss.[7]


## IV. CONCLUSION

Having reviewed the entire file in this matter, the parties' submissions, and the applicable

law, and for the above-stated reasons, the Court hereby

ORDERS that Defendant's motion to dismiss, *see* Dkt. No. 109, is **GRANTED**; and the

Court further

ORDERS that the Clerk of the Court shall enter judgment in favor of Defendant and

close this case.


**IT IS SO ORDERED.**


Dated: May 19, 2017
       Syracuse, New York

                                    _____
                                    Frederick J. Scullin, Jr.
                                    Senior United States District Judge

---

[7] At the end of their memorandum of law in opposition to Defendant's motion to dismiss, Plaintiffs state that, "[i]n the event the Court determines any portion of the Amended Complaint to be legally insufficient, Plaintiffs request leave to amend their Amended Complaint, pursuant to Fed. R. Civ. P. 15. Plaintiffs should be given the opportunity to replead." *See* Dkt. No. 113 at 25. To the extent that Plaintiffs intended this discussion to serve as a motion for leave to amend their amended complaint, it does not comply with this Court's Local Rules regarding such motions; and, therefore, the Court will not consider it. *See* L. R. 7.1(a)(4).